UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
TINA MARIE MENTEN,                      )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        Civil Action No. 09-cv-11545-LTS
                                        )
STARBUCKS CORP.,                        )
                                        )
            Defendant.                  )
_____)


ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

April 26, 2012

SOROKIN, C.M.J.

        Pending before the Court is Defendant's Motion for Summary Judgment (Docket #39).  For

the reasons that follow, Defendant's Motion for Summary Judgment is hereby DENIED.

I.      FACTUAL BACKGROUND

        Plaintiff was employed as a barista at a Starbucks located in Saugus, Massachusetts (the

"Store") from June 2006 through November 17, 2008.  (Doc. 46 at ¶¶ 2, 8, 14, 116).  Starbucks

refers to all of its employees as "partners."  Id. at ¶ 1 n.3.  As a barista, Plaintiff received customer

orders at the register, compiled customer orders, communicated orders to other partners, prepared

orders for customers, made beverages, tendered transactions at the cash register, handled cash,

cleaned dishes, handled trash, maintained store cleanliness, merchandised retail, stocked shelves,

and completed various other tasks.  Id. at ¶ 14.

        Plaintiff received and reviewed the 2006 version of the Starbucks' Partner Guide (the

"Handbook") upon hire.  Id. at ¶ 16.  Plaintiff also received and reviewed the 2007 version of the

Handbook while she worked at Starbucks.  Id.  The Handbook, which is distributed to all partners,

provides in part: "One of Starbucks Coffee Company's Guiding Principles is to 'provide a great

work environment and to treat each other with respect and dignity.'  Accordingly Starbucks strictly

prohibits discrimination, sexual harassment or harassment[.]"  Id. at ¶ 3.  The Handbook also states,

> As a Starbucks Partner, It Is Your Responsibility To: (1) Treat others with respect
> and dignity; maintain a professional workplace; (2) Understand Starbucks Anti-
> Harassment and Discrimination Policy, including the Complaint Procedure; (3) Take
> immediate steps to end the offensive behavior by requesting that it stop, if
> comfortable doing so; (4) Immediately report your concerns to your manager, Partner
> Resources Team member or the Business Conduct Helpline at (800) 611-7792[.]

Id. at ¶ 4.  Starbucks' Business Conduct Helpline (the "Helpline") is available twenty-four hours a

day, seven days a week.  Id. at ¶ 6.  The Helpline was established to answer partners' questions

about legal or ethical issues at work, to clarify Starbucks policies, and to provide yet another means

to report any form of harassment or discrimination.  Id.  Partners may choose to remain anonymous

when calling the Helpline and all concerns reported to the Helpline are taken seriously and treated

in a confidential manner.  Id.  Calls made to the Helpline go to a centralized location but Starbucks

District Managers are made aware of them through their Partner Resources Manager.  Id. at ¶ 7.

In July 2007, Shawn Forziati became Store Manager.  Id. at ¶¶ 19-20.  To become Store

Manager, Forziati went through an eight-week training period that included a class on harassment

in the workplace.  Id. at ¶ 21.  Plaintiff knew Forziati at the time Forziati started working as Store

Manager because Forziati had been a regular customer.  Id. at ¶ 22.  Plaintiff considered Forziati to

be a friendly manager.  Id. at ¶ 23.

Menten would sometimes wear a shirt to work that exposed the tattoo on her arm, in

violation of Starbucks policy.  Id. at ¶ 25.  In February 2008 and on other occasions, Forziati

reprimanded Plaintiff for this policy violation.  Id.  Other partners with visible tattoos were not reprimanded.  (Doc. 42-1 at 36-37).  Forziati also told Plaintiff to conceal her nose ring which was in violation of Starbucks policy although she had worn it for a year without comment.  Id. at 107-08.

Partners regularly talked about their personal lives while working in the Store together. (Doc. 46 at ¶ 60).  Plaintiff thought that Assistant Store Manager Ralph Vargas made inappropriate statements at work.  (Doc. 42-1 at 30).  Vargas talked to Plaintiff about his love life and said of a girlfriend "She kept me up real late again."  Id. at 30-31.  Plaintiff commented to Forziati that Vargas "likes to really talk about his personal life."  Id. at 32.  In response, Forziati said "Hmm. Well I'll talk to him about that."  Id.  Forziati also spoke about her personal life at work.  (Doc. 46 at ¶ 62).  On one occasion when Plaintiff opened the Store with Forziati, Forziati mentioned that "makeup sex" was great.  Id.  Forziati often made statements about getting into arguments with her wife, about not getting enough attention at home, and that her wife did not kiss her anymore.  (Doc. 42-1 at 73-75).  Although she found these conversations with Forziati inappropriate (id. at 76), Plaintiff never made a complaint to anyone (doc. 46 at ¶ 62).  Plaintiff also witnessed partner Russell Stearns talk about his personal life at work; he would talk about girls he dated and about customers he considered attractive.  Id. at ¶ 64.  Plaintiff reported to Laura Nicholson, shift supervisor, that Stearns and others were "out of control" and that they were "inappropriate and act inappropriate in front of customers."  (Doc. 42-1 at 81-82).  Plaintiff also witnessed partner Michael Roback talking loudly and cursing.  (Doc. 46 at ¶ 66).  Plaintiff reported to Forziati that she thought Roback was too loud and not right for retail.  Id.  Plaintiff observed partner Paul Hearns place a tube of caramel in his genital area to make a joke; however, she did not report this behavior to anyone.  Id. at ¶ 63.

On April 28, 2008, Plaintiff was sexually assaulted by a roommate who had no relationship with Starbucks.  Id. at ¶¶ 32-35.  The next day, Plaintiff went to work where she was reprimanded for wearing an inappropriate shirt, which had been noticed by Regional Manager Francesca Perry. Id. at ¶ 35.  After her shift at the Store, Plaintiff proceeded to her second job at Partners in Rehab. Id. at ¶ 36.

On her way home from Partners in Rehab, Plaintiff noticed that there were police cars parked at the Store, which she passed on her drive home.  Id. at ¶ 37.  Because she knew the police officers, who were regular customers at the Store, Plaintiff decided to stop to talk to them about what had happened.  Id.  Plaintiff asked one of the officers, Stacey Forni, if they could speak in the back room of the Store where the partner area was.  Id. at ¶ 38.  Plaintiff was not working at that time and Officer Forni was in the Store as a customer.  Id.  Plaintiff then told Officer Forni what had transpired the night before.  Id.  Officer Forni recommended that Plaintiff go to the hospital to have a rape kit done.  Id.

Plaintiff called Forziati, who was not at work, told her what had happened, and asked her to come to the hospital with her.  Id. at ¶ 40.  Plaintiff called Forziati because she was both Plaintiff's friend and her manager.  (Doc. 51 at 9).

Forziati met Plaintiff at the hospital that evening and stayed for a few hours.  (Doc. 46 at ¶ 42).  While Forziati was at the hospital, she told Plaintiff that Plaintiff did not need to come into work the next day.  Id. at ¶ 43.

Plaintiff continued to discuss the sexual assault with Forziati following the hospital visit. Id. at ¶ 44.  Plaintiff also spoke with a co-worker at Partners in Rehab about the sexual assault. (Doc. 49-1 at ¶ 14).  Plaintiff also told Starbucks partner Lisa Tozier about the sexual assault while

outside of the Store.  (Doc. 49 at 6).  Tozier assumed that this information should be kept confidential.  Id.  Plaintiff denies initiating conversation with any other Starbucks employee about her sexual assault.  (Doc. 49-1 at ¶ 14).  Plaintiff states that she was forced to speak with other Starbucks employees about the sexual assault when those colleagues approached her and expressed concern and other sentiments.  Id.  Forziati spoke with District Manager Stephen DiNisco about Plaintiff's sexual assault to inquire about resources available to help a partner who had suffered a sexual assault.  (Doc. 46 at ¶ 48).

Following her sexual assault, Plaintiff spoke to Forziati about needing to find a new apartment because she did not want to live in the place where the incident had occurred.  Id. at ¶¶ 51-52.  Forziati and her wife told Plaintiff of an apartment that was available next door to them owned by the same landlord.  (Doc. 42-1 at 69-70).  Plaintiff moved into that apartment.  Id. at 70.  While living next door, Plaintiff went over to Forziati's house for barbeques on a few occasions.  (Doc. 46 at ¶ 57).  At one barbeque at Forziati's house, Plaintiff also socialized with Vargas and his wife.  Id. at ¶ 58.  On occasion, Plaintiff cut Forziati's hair at her house.  Id. at ¶ 59.

In late summer or early fall of 2008, the Store began receiving shipments of bananas for fruit smoothies.  Id. at ¶ 68.  After the banana shipments began to arrive, Plaintiff witnessed Stearns putting a banana in his crotch to simulate genitalia.  Id. at ¶ 69.  When Plaintiff questioned Stearns as to what he was doing, Stearns answered, "I'm just having fun."  Id. at ¶ 70.  Plaintiff reported the incident to Forziati.  (Doc. 52 at 7; Doc. 42-2 at 119).  That same month or the following month, Plaintiff arrived at work one day to find a banana sticking out of a crack in the wall.  (Doc. 46 at ¶ 73).  Plaintiff did not know who had placed the banana there and nothing was written on the banana.  Id.  This upset Plaintiff because it was not sanitary and the store had a problem with fruit

flies.  Id. at ¶ 74.  Plaintiff discussed her concern with the manager or supervisor opening with her that day.  Id.  Plaintiff also complained to other partners about the banana.  Id. at ¶ 75.  Upon opening the Store during that same week, Plaintiff found bananas in various places, such as sticking out of the top of the espresso machine and hanging off the side of the sink.  Id. at ¶ 77.  Plaintiff complained to the manager or supervisor opening with her, who said he or she would talk to the people who had closed and straighten out the situation.  Id.

That same day, a regular customer brought Plaintiff a banana with "Owned by Tina" written on it that the customer had found in the napkin dispenser at the condiment bar.  Id. at ¶ 78.  Plaintiff complained of this incident to Forziati stating that she found it "repulsive" and that she was "extremely mortified" and "humiliated."  (Id. at ¶ 79; doc. 42-2 at 124).  Plaintiff handed the banana over to Vargas, who had opened the Store with her, and asked "When is this going to stop?"  (Doc. 46 at ¶ 80).  Vargas took the banana from her and said, "No, [Forziati's] going to see this."  Id.  Later that day, Plaintiff spoke with Forziati about the banana.  Id. at ¶ 81.  Forziati told Plaintiff that it was not a big deal and that Plaintiff should "lighten up."  Id.  Forziati did speak with every partner in the Store but could not find who was responsible for the incident.  Id.  There were no further incidents involving bananas.  Id. at ¶ 82.

During the week of October 23, 2008, Forziati spoke with Plaintiff about yelling and swearing at a co-worker, explaining to her that such behavior was unacceptable.  Id. at ¶ 83.  Forziati also reminded Plaintiff that they had discussed Plaintiff's unacceptable behavior previously.  Id.

On October 31, 2008, Plaintiff reported that $325 in cash was stolen from her purse when it was in the back room of the Store.  Id. at ¶ 84.  Plaintiff reported to Forziati that she suspected a partner named Rachel was to blame.  Id. at ¶ 85.  Forziati investigated the theft.  Id. at ¶ 86.

6

Although recommended by Forziati, Plaintiff never filed a police report.  Id.

On November 3, 2008, Plaintiff found graffiti in the women's restroom at the Store.  "Tina is a Bitch" and "Tina Sucks Dick" was carved into the back of the stall door and "Tina is a Bitch" was written in marker on the wall of the stall.  Id. at ¶¶ 86, 89.  To Plaintiff's knowledge, she was the first person to see the graffiti.  (Doc. 42-2 at 104-05).  Plaintiff reported the graffiti to Vargas, who seemed genuinely upset and made an out-of-order sign for the stall with the graffiti.  (Doc. 46 at ¶ 90).  Vargas reported the graffiti to Forziati, who washed off the graffiti written in marker with a washcloth.  Id. at ¶ 91.  Forziati called DiNisco about the graffiti who told her to call the incident into the Facilities Contact Center ("FCC") as an emergency so that the stall could be repainted within 24-48 hours.  Id. at ¶ 92.  Forziati or Vargas called FCC that day and the stall was kept out of order until the repair was made on November 5, 2008.  Id. at ¶¶ 93, 99.

On the morning of November 4, 2008, Plaintiff found additional graffiti written in black marker behind the trash can in the bathroom that read "Tina sucks bananas."  Id. at ¶ 94.  Plaintiff, who was upset, reported the incident to Forziati and said that she wanted a transfer.  Id. at ¶ 95.  Forziati told Plaintiff that she would do whatever she could to stop these incidents from occurring so Plaintiff would not want to quit or transfer.  Id. at ¶ 96.  Forziati met with all shift supervisors to see if anyone had information as to who might be responsible.  Id. at ¶ 97.  Forziati also spoke with each partner about the graffiti, reiterating the consequences of engaging in that type of behavior. Id. at ¶ 98.

On November 10, 2008, Amelia, a shift supervisor from another Starbucks location, covered a shift at the Store.  Id. at ¶ 100.  That morning, Amelia had Plaintiff set up the pastry case, a job to which Plaintiff was not accustomed.  Id. at ¶ 101.  Amelia later accused Plaintiff of hiding the

schedule.  <u>Id.</u> at ¶ 102.  This led to a "clash" between Plaintiff and Amelia.  <u>Id.</u>  When she left work, Plaintiff stated, "I'm out."  <u>Id.</u> at ¶ 103.  Forziati told her later that night not to come in the next day and that before Plaintiff came back to work, Forziati needed to talk to DiNisco.  (Doc. 42-2 at 154-57).  On November 12, 2008, Plaintiff met Forziati at the Store to talk about the November 10, 2008, incident.  (Doc. 46 at ¶ 107).  Forziati informed Plaintiff that Forziati would have to speak to DiNisco about what had happened.  <u>Id.</u>

On November 14, 2008, Plaintiff met with Forziati and DiNisco at a Starbucks in Melrose to discuss whether she could return to work.  <u>Id.</u> at ¶ 108.  At the meeting, DiNisco explained that Starbucks was still looking into the theft and the graffiti in the bathroom.  <u>Id.</u> at ¶ 109.  DiNisco also addressed Plaintiff's outbreaks and inability to maintain her composure at work, a subject about which Plaintiff acknowledged she had spoken with Forziati.  <u>Id.</u> at ¶ 109.  DiNisco brought up that he knew Plaintiff was going through rough times as a result of the sexual assault.  <u>Id.</u>  Plaintiff was mortified that DiNisco knew anything about the assault as she had not told him.  (Doc. 42-2 at 161).  DiNisco explained that Starbucks had various resources to help partners deal with personal issues.  (Doc. 46 at ¶ 109).  DiNisco informed Plaintiff that she would be notified within a week if she could return to work.  <u>Id.</u> at ¶ 111.

The decision of whether to reinstate Plaintiff lay with Forziati.  (Doc. 42-3 at 255-56).  In order to advise Forziati, DiNisco spoke with Regional Director Perry and Partners Resources manager Paul Pinto regarding Plaintiff's sexual assault as a potential mitigating circumstance for Plaintiff's behavior.  <u>Id.</u> at 256.  DiNisco advised Forziati not to reinstate Plaintiff's employment because he felt the circumstances under which Plaintiff quit were consistent with the lack of composure about which Plaintiff had previously been warned.  (Doc. 46 at ¶ 114).  Forziati decided

not to reinstate Plaintiff.  Id. at ¶ 115.

On March 5, 2009, Plaintiff filed an administrative charge with the Massachusetts Commission Against Discrimination ("MCAD") alleging sexual harassment and retaliation.  (Doc. 42-3 at 273).  On March 1, 2010, the MCAD dismissed Plaintiff's charge with a finding of lack of probable cause.  Id. at 276.

On June 15, 2009, Plaintiff filed a complaint in Middlesex Superior Court.  (Doc. 1). Defendant removed the action on September 16, 2009. Id.

II.     STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) .  Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Moreover, the Court  is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."  Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

III.     DISCUSSION

A.     Hostile Work Environment Sexual Harassment - Count I

It is unlawful "[f]or an employer, personally or through its agents, to sexually harass any employee." Mass. Gen. Laws ch. 151B, § 4(16A). "Sexual harassment" is defined, in relevant part, as:  "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." Id. § 1(18).  Thus, in order to establish a prima facie case of sexual harassment in a hostile workplace, the plaintiff must demonstrate "(i) she was subjected to unwelcome, unwanted harassment (which is either sexual in nature, or based upon her sex), and that (ii) the harassment was severe and pervasive enough to create an abusive environment (iii) about which her employer knew or should have know[n]." Ritchie v. Mass. State Police, 13 Mass. L. Rep. 561, *8 (Mass. Super. Ct. 2001) (quoting Rose v. Baystate Med. Ctr., Inc., 985 F. Supp. 211, 217 (1997)).

"To constitute actionable harassment, the claimed conduct must be both objectively and subjectively offensive." Messina v. Araserve, Inc., 906 F. Supp. 34, 36 (D. Mass. 1995) (citing Ramsdell v. W. Mass. Bus Lines, Inc., 615 N.E.2d 192, 195 (Mass. 1993)).  "That is, the court must consider whether, in the totality of the circumstances, the alleged conduct is sufficiently severe and pervasive to interfere with a hypothetical reasonable person's work performance." Id. (quotation omitted).  "The environment must be sufficiently hostile or abusive in light of all of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

10

interferes with an employee's work performance.'" Thompson v. Coca-Cola Co., 522 F.3d 168, 180

(1st Cir. 2008) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).  "[S]imple

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment."  Faragher, 524 U.S. at 788

(internal quotation omitted).  Such a standard "filter[s] out complaints attacking the ordinary

tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes,

and occasional teasing."  Id. (quotation omitted).

    Plaintiff points to the following conduct as evidence of a hostile work environment:  Forziati

saying that "make-up sex" with her wife is good and that her wife did not kiss her anymore; Vargas

discussing his sex life with Plaintiff; partners using tubes of caramel and bananas to simulate male

genitalia; partner Stearns discussing who he dated and customers he "wanted to bang;" other

partners discussing Plaintiff's sexual assault with her and among themselves at work;[1] graffiti in the

women's restroom that read "Tina is a bitch," "Tina sucks bananas," and "Tina sucks dick;" and

sexual innuendos.[2]  The majority of these incidents occurred after Plaintiff's sexual assault.

    Plaintiff's workplace environment at Starbucks changed after her sexual assault (which was

---

    [1] Defendant contended at the hearing that the Court, rather than the Plaintiff, raised the
discussions among co-workers of Plaintiff's sexual assault as evidence of a hostile work
environment.  Defendant is incorrect.  In her response to Defendant's motion, Plaintiff
specifically cited "[c]o-workers discussing Ms. Menten's sexual assault with her and among
themselves at work" as evidence of the hostile work environment.  (Doc. 45 at 5).  Starbucks is
correct that neither party addressed the significance of these facts to Count I in any detail.

    [2] Plaintiff, citing to Tozier's testimony, states that partners stated "What are you wearing
under that apron?  Maybe you shouldn't be wearing anything under that apron."  However,
Tozier never testified that such a comment was made, instead she stated that comments of that
nature were made.  (Doc. 49 at 7-8).  The Court treats that as evidence of sexual innuendos
which are not the same as an employee sharing personal details of his or her sex life.

plainly completely unrelated to Starbucks).  Up to that point, her claim consists of allegations of sexual discussions and one incident with a partner placing a tube of caramel in his genital area. According to Tozier, the sexual comments and innuendo were made on a regular, daily basis,  (Doc. 49 at 7), though Plaintiff's testimony is silent on that point.   Contrary to Plaintiff's counsel's argument, these discussions alone are insufficient to sustain Plaintiff's burden.  Plaintiff did not find the atmosphere, to this point, hostile, intimidating, or humiliating.  Rather, she testified that she recalled no "issues" at the store prior to her sexual assault.  (Doc. 42-1 at 27).  Thus, the events during that period alone cannot sustain her claim.  See Ramsdell, 615 N.E.2d at 196 ("[A]n employee who alleges sexual harassment must show that the employer's conduct was intentionally or in effect hostile, intimidating, or humiliating to the plaintiff in a way which affected her performance or the conditions of her employment.") (emphasis in original).  While Plaintiff did not participate in the sexual comments and innuendo as did the Plaintiff in Ramsdell, (doc. 42-1 at 33), the nature of the discussions Plaintiff described differ markedly from the facts described by the Court in Ramsdell as sufficient to sustain a claim.  Only Tozier described daily sexual innuendos; Plaintiff described co-workers discussing dates, relationships, and the quality of their sexual relationships.  In contrast to Ramsdell, the co-workers were not giving each other sexually explicit gifts, displaying naked posters in the workplace, grabbing co-workers' genitals, pulling down co-worker's pants, or speaking in "rough" language with communication "rife with sexually explicit language and sexual innuendos." See Ramsdell, 615 N.E.2d at 194; see also Faragher, 524 U.S. at 788 ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") (internal quotation omitted).

During the relatively short period between her sexual assault on April 28, 2008, and her termination from Starbucks on November 17, 2008, Plaintiff endured, on her facts, something different.  First, there were a series of banana incidents culminating in a customer handing her a banana with the words written on it to the effect of "Owned by Tina."   A jury could reasonably conclude these acts were targeted at Plaintiff and that, at least, the last act was sexual in nature.  Next, Plaintiff found graffiti in the bathroom stall saying "Tina sucks dick."  The next day, she discovered more graffiti behind the trash can in the bathroom that read "Tina sucks bananas."  The graffiti was plainly targeted, sexual, and offensive (both subjectively and objectively).  Starbucks responded promptly and appropriately to each of the foregoing incidents.  See Messina, 906 F. Supp. at 38 ("[A]n employer is liable for sexual harassment perpetrated by an employee if it knew or should have known of the harassment, unless the employer can show it took appropriate steps to halt the harassment.").

There is, however, one more set of facts upon which Plaintiff relies - the discussion of her sexual assault.  Several pieces of relevant evidence require consideration:

- Plaintiff stated that two different employees, both from other stores (one male manager and one female shift supervisor from two different stores), expressed to Plaintiff their sympathy after learning that Plaintiff was sexually assaulted.[3]  (Doc. Doc. 49-1 at ¶ 3).

- Plaintiff stated that she was "forced to speak with colleagues about the rape because her colleagues approached her and expressed concern and other sentiments."  Id. at ¶ 14.

---

[3]  Plaintiff asserts that these employees stated that Forziati was the source of their information.  That assertion, without an affidavit from the employees, is inadmissible hearsay, however, Plaintiff's reports of the employees' statements (about the sexual assault as opposed to about the source of their knowledge) are admissible for the non-hearsay purpose of proving the employees' knowledge of the sexual assault or the fact that words about the assault were spoken. See Noviello v. City of Boston, 398 F.3d 76, 84-85 (1st Cir. 2005).

- Plaintiff was asked the names of the persons to whom she revealed the sexual assault and listed only Forziati, a coworker at her other job, and the police officer.  Id..

- Forziati testified that she heard Plaintiff tell a co-worker (Laura Nicholson) about the sexual assault.  (Doc. 42-3 at 236).

- Forziati testified that "[a]lmost all of the females in the store knew [of Plaintiff's sexual assault] within days" of the crime.  (Id.)  Forziati testified she heard some female (but not male) co-workers discussing the sexual assault of Plaintiff and instructed them that such a discussion was not appropriate.  Id.

- Tozier, a co-worker at the Starbucks store, testified that Plaintiff disclosed the sexual assault to her, outside the store, and that she (Tozier) treated it as confidential.[4] (Doc. 49 at 6).

From these facts a jury could reasonably conclude that some employees at the Store as well as some employees and managers of other stores knew of and were discussing the sexual assault she suffered.  The jury could reasonably conclude that such widespread knowledge and discussion of Plaintiff's sexual assault was against Plaintiff's will and that it was sufficiently subjectively and objectively sexually offensive to create a "humiliating . . . work environment."  Mass. Gen. Laws ch. 151B, § 1(18); see Mousa v. Mukasey, 530 F.3d 1025, 1027 (9th Cir. 2008) ("Many victims of sexual assault feel so upset, embarrassed, humiliated, and ashamed about the assault that they do not tell anyone that it occurred."); Bloch v. Ribar, 156 F.3d 673, 685 (6th Cir. 1998) ("Releasing the intimate details of rape will therefore not only dissect a particularly painful sexual experience, but

---

[4] Plaintiff relies upon this statement in her papers. Although the Court notes it is at odds with Plaintiff's sworn interrogatory answers in which she does not reveal Tozier as someone to whom she revealed the sexual assault, Defendant has not complained of the lack of disclosure. To the Court's knowledge, Plaintiff never supplemented her sworn interrogatory answers. Federal Rule of Civil Procedure 26(e) imposes a duty on a party to supplement or correct its response to an interrogatory "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"

often will subject a victim to criticism and scrutiny concerning her sexuality and personal choices regarding sex."). Plaintiff herself testified that she was "shocked and mortified" that DiNisco knew of the sexual assault. (Doc. 42-2 at 161-64). The paucity of Plaintiff's submission renders the case a somewhat close one as Plaintiff has failed to submit any evidence regarding the frequency or timing of these discussions and just the briefest of evidence regarding the nature of these discussions or her reaction to the discussions. Nonetheless, the nature of the topic and the fact that co-workers at her store as well as a shift supervisor and a manager from two separate stores knew of the sexual assault satisfies Plaintiff's burden on summary judgment especially when combined with her other evidence.

Certainly, material factual disputes and competing or conflicting factual inferences pervade the foregoing factual recitation. Forziati disputes she told the co-workers about Plaintiff's sexual assault; she says Plaintiff told the co-workers. (Doc. 42-3 at 235). Indeed, Forziati says that Plaintiff authorized her to reveal the sexual assault to DiNisco as well. Id. at 230. Nonetheless, the facts establish co-workers (and others) knew and discussed the topic. (Id. at 236; doc. 49-1 at ¶ 14). Because Plaintiff states she told only Forziati, the police officer, and a co-worker from another job (doc. 49-1 at ¶ 14), she has denied telling anyone else. Tozier said Plaintiff informed her out of the Store, a disclosure contrary to Plaintiff's interrogatory answers, but seemingly adopted by her counsel.[5] (Doc. 46 at ¶ 143; doc. 49 at 6). Forziati, Tozier, Plaintiff, and DiNisco (who learned from Forziati) each had the opportunity to disclose to at least the co-workers at the Store, if not the

---

[5] While the testimonial conflict between Tozier and Plaintiff on this point might pose a substantial credibility issue for Plaintiff at trial, credibility is not an issue for the Court on summary judgment. Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) ("[T]he ground rules for summary judgment leave no room for credibility determinations[.]") (quotation omitted).

employees from other locations.  On this record, especially in light of the knowledge possessed by a manager and a shift supervisor at two different stores, a reasonable jury could conclude that Starbucks (via Forziati or DiNisco) informed others.

Accordingly, Defendant's Motion for Summary Judgment as to Count I is DENIED.

B.       Invasion of Privacy - Count II

"A person shall have a right against unreasonable, substantial or serious interference with his privacy."  Mass. Gen. Laws ch. 214, § 1B.  "To constitute an invasion of privacy, the invasion must be both unreasonable and serious or substantial.  French v. UPS, 2 F. Supp. 2d 128, 131 (D. Mass. 1998); see Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 681 (Mass. 2005).  "The statute, essentially, proscribes 'disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest.'"  Ayash, 822 N.E.2d at 682 (quoting Bratt v. Int'l Bus. Mach. Corp., 467 N.E.2d 126, 133-34 (Mass. 1984)).

Starbucks sets forth three arguments as to why Plaintiff's claim must be dismissed: (1) Plaintiff did not keep the information private; (2) Forziati was acting as a friend, not as an agent of Starbucks; and (3) Starbucks cannot be held liable for information disclosed internally for a legitimate reason.

While conceding that many people consider information about a sexual assault to be highly personal or intimate in nature, Starbucks asserts that Plaintiff did not treat the information concerning her assault as highly confidential or personal and, therefore, she cannot sustain a claim of invasion of privacy.  In support of this argument, Starbucks cites to the fact that Forziati overheard Plaintiff sharing the details of her assault with partner Nicholson and, thereafter, other partners discussed Plaintiff's assault, meaning that those partners had either heard the information

from Nicholson or from Plaintiff herself.   However, Plaintiff denies that she spoke of her assault with Nicholson.   Whether Plaintiff spoke of the assault to Tozier is unclear as she omitted that in her interrogatory answers, but her counsel appears to rely upon Tozier's testimony.   See supra.   In any event, any such discussion occurred outside of the Store, according to Tozier who also stated that she understood this information to be confidential.   Starbucks fails to address the possibility that Forziati dispersed the information concerning Plaintiff's assault to other Starbucks partners, an inference that could reasonably be drawn from the circumstances as already explained.

The Court finds there is a material factual dispute as to who disclosed the facts concerning Plaintiff's assault to the Starbucks partners.   At this juncture, the Court must resolve the dispute in Plaintiff's favor.   LeBlanc, 6 F.3d at 841.   The Court agrees that information concerning a sexual assault is generally highly personal or intimate in nature.   See Bonome v. Kaysen, 17 Mass. L. Rep. 695, *12-13 (Mass. Super. Ct. 2004) (sexual affairs are "of an intensely intimate and personal nature").   The Court finds that Plaintiff's disclosure of the incident to her manager Forziati, one other Starbucks partner while outside the Store (Tozier, if that is Plaintiff's position), and a co-worker at her job at Partners in Rehab does not demonstrate that Plaintiff failed to treat the information concerning her assault as highly confidential or personal.   Although there can be no expectation of privacy in information that has already filtered into the public domain, Brown v. Hearst Corp., 862 F. Supp. 622, 631 (D. Mass. 1994), cited in Pendleton v. City of Haverhill, 156 F.3d 57, 64 (1st Cir. 1998), the Court finds that Plaintiff's disclosure of the assault in a non-public arena to three people does not equate to the information being in the public domain.

With respect to Starbuck's second assertion, Plaintiff stated that she called Forziati and told her of the assault because she was Plaintiff's friend as well as Plaintiff's manager.   (Doc. 51 at 9).

Thus, there is a material factual dispute as to whether Forziati was acting as an agent of Starbucks when Plaintiff told her of the incident which must be resolved in Plaintiff's favor.

Starbucks argues that, even if Plaintiff treated the information concerning her assault as highly confidential and personal, Forziati's and DiNisco's decisions to reveal this information to superiors was not actionable because the disclosures were made for legitimate reasons, namely whether Starbucks could find a way for Plaintiff to perform her job in the wake of an upsetting episode.   Regardless of whether this was a legitimate reason for Forziati and DiNisco to reveal the information to their supervisors, a question the Court need not now decide, Starbucks offers no legitimate reason for Forziati or DiNisco to reveal the information to other Starbucks partners.   As discussed above, there is a material factual dispute as to who revealed the information concerning the assault to the Starbucks partners.

 Accordingly, Defendant's Motion for Summary Judgment as to Count II is DENIED.

IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED.

Trial will commence June 11, 2012, with a Final Pretrial Conference on June 7, 2012, at 3:00 p.m.  A separate trial order will issue.  In light of the age of this case, the Court does not anticipate any substantial continuances in the trial date.

SO ORDERED.

_____/s / Leo T. Sorokin_____
UNITED STATES MAGISTRATE JUDGE

18